**HCSC–LAUNDRY,**

v.

**UNITED STATES of America, Appellant.**

**No. 79–2286.**

United States Court of Appeals, Third Circuit.

Argued Feb. 21, 1980.

Decided June 6, 1980.

As Amended June 10, 1980.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Leonard J. Henzke, Jr.,

David English Carmack (argued) Tax Division, Dept. of Justice, Washington, D. C., for appellant; Peter F. Vaira, U. S. Atty., Philadelphia, Pa., of counsel.

Norman A. Peil, Jr. (argued), Michael J. Egan, Peil & Egan, P. C., Easton, Pa., for appellee.

Steven John Fellman, Henry Ashton Hart, Loomis, Owen, Fellman & Howe, Washington, D. C., for amicus curiae Textile Rental Services Association of America.

Thomas C. Brickle, Washington, D. C., for amicus curiae Intern. Fabricare Institute.

Before ROSENN, SLOVITER, Circuit Judges and LAYTON, District Judge.*

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

On this appeal by the IRS from summary judgment entered against it, we must decide whether Congress, in enacting section 501(e) of the Internal Revenue Code, which specifically permits joint hospital facilities performing specified services to be treated as tax exempt charitable organizations under section 501(c)(3) of the Code, intended that joint hospital facilities performing services not specifically included in section 501(e) could nevertheless be treated as tax exempt charitable organizations under section 501(c)(3).

### II.

Plaintiff HCSC-Laundry, a non-profit corporation with its principal office in Allentown, Pennsylvania, was incorporated under the Pennsylvania Nonprofit Corporation Law on January 3, 1967.[1] It provides laundry and linen service to fifteen non-profit hospitals located in the Greater Lehigh Valley, Reading, Scranton, and suburban Philadelphia, Pennsylvania, and to the Cetronia Ambulance Corps, which serves a village adjacent to Allentown, Pennsylvania. All the hospitals and the ambulance corps have received federal income tax exemptions under section 501(c)(3) of the Internal Revenue Code.

The formation of HCSC-Laundry followed an investigation into the various possible ways in which laundry service could be provided to the area hospitals. In early 1966 the Lehigh Valley and Health Planning Council, an agency under the Hill-Burton Act,[2] received requests from some of

---

* Honorable Caleb R. Layton, III, United States District Judge for the District of Delaware, sitting by designation.

1. Its purpose, as set forth in its Articles of Incorporation, as amended May 29, 1970, is:
   A. To operate and maintain a hospital laundry and linen supply program for those public hospitals and non-profit hospitals or related health facilities organized and operated exclusively for religious, charitable, scientific, or educational purposes that contract with this corporation.
   B. To cooperate with the Greater Lehigh Valley Hospital and Health Planning Council in carrying out the foregoing purposes.
   C. To accomplish the foregoing purposes in a manner consistent with the provisions of Section 501(c)(3) of the Internal Revenue Code of 1954.

2. The Hill-Burton Act, a funding statute, was enacted, *inter alia*, to assist the states in carrying out programs for construction and modernization of "such public or other nonprofit community hospitals and other medical facilities as may be necessary, in conjunction with existing facilities, to furnish adequate hospital, clinic or similar services," 42 U.S.C. § 291. In order to participate in the program, states have to submit comprehensive plans designating "a single State agency as the sole agency for the administration of the plan, or designat[ing] such agency as the sole agency for supervising the administration of the plan," 42 U.S.C. § 291d(a)(1), as well as indicating the existing facilities, the needs within the state and a construction and modernization program which will meet those needs. 42 U.S.C. § 291d(a). A 1964 amendment emphasized the need for comprehensive planning in metropolitan and local areas. The Hospital and Medical Facilities Amendments of 1964, Pub.L. 88–443, § 2, 78 Stat. 447, added new section 318 to the Public Health Service Act, 42 U.S.C. §§ 201 *et seq.*, which authorized expenditure of funds over the following five year period for grants to state agencies chosen in accordance with 42 U.S.C. § 291d(a)(1) to cover part of the costs of "projects for developing (and from time to time revising) and supervising and assisting in the carrying out of comprehensive regional, metropolitan area, or other local area plans for coordination of existing and planned health facilities, and facilities related thereto, and services

the area hospitals to approve funds requested to modernize their hospitals' in-plant laundries. The Council investigated and considered alternate sources of laundry services available to area hospitals. Among the options the Council considered were individual hospital laundries, commercial off-premises facilities, joint facilities with a single hospital laundry providing services to one or more hospitals beside itself, and shared non-profit, off-premises laundries which service several non-profit hospitals. A joint service was rejected because no hospital in the area had sufficient laundry facilities to service more than itself. A commercial laundry contacted was not interested in handling the full volume of laundry business of all the hospitals involved, and most of the other available commercial laundries were considered incapable of handling the heavy volume. The Council concluded that a shared non-profit, off-premises laundry would best accommodate the requirements of the member hospitals both from the viewpoint of quality of the service and economies of scale. Accordingly, HCSC-Laundry was formed.[3] Its laundry plant was built and equipped at a cost of approximately 2 million dollars, which it secured from local banks by using as collateral fifteen year contracts from 10

area hospitals. It employs approximately 125 people.

The corporation has no capital stock. Each participating hospital is a dues-paying member of the corporation. HCSC dues were $500 for the taxable year in issue. Centronia Ambulance Corps does not pay dues in order to receive laundry service. HCSC-Laundry's only income in addition to the dues is a laundry charge of 1½¢ per pound of laundry serviced which is charged to each customer over the actual cost. "Cost" for this purpose includes operating expenses, debt retirement, and linen replacement. This charge in excess of cost is placed in a fund for equipment replacement and acquisition.

HCSC-Laundry sought exemption from federal income tax and, on March 26, 1976, filed an Application for Recognition of Exemption (Internal Revenue Service Form 1023) under Section 501(c)(3) of the Internal Revenue Code. This section authorizes exemption for corporations "organized and operated exclusively for religious, charitable, scientific, . . . or . . . educational purposes . . . no part of the net earnings of which inures to the benefit of any private shareholder or individual . . . ." I.R.C. § 501(c)(3).[4] It is stipulated that plaintiff has never made a distri-

---

provided by such facilities." *See generally* Comment, *Comprehensive Health Planning—Federal, State, Local: Concepts and Realities,* 1970 Wis.L.Rev. 838, 843–46.

3. Taxpayer was originally named Hospital Central Services Corporation. Its name was changed in 1970.

4. Section 501 provides in pertinent part:
§ 501. Exemption from tax on corporations, certain trusts, etc.
(a) Exemption from taxation—An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502 or 503.
\* \* \* \* \* \*
(c) List of exempt organizations—The following organizations are referred to in subsection (a):
\* \* \* \* \* \*
(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary,

or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.
\* \* \* \* \* \*
(e) Cooperative hospital, service organizations—For purposes of this title, an organization shall be treated as an organization organized and operated exclusively for charitable purposes, if—
(1) such organization is organized and operated solely—
(A) to perform, on a centralized basis, one or more of the following services which, if

bution of money or property nor have any net earnings inured to the benefit of any member or individual.

The IRS denied the application stating: Section 501(e) of the Code provides for exemption from Federal income tax of certain hospital service organizations organized and operated solely to perform specified services for member hospitals. Section 501(e)(I)(a) [sic] of the Code lists the specified services as data processing, purchasing, warehousing, billing and collection, food, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) services.

Since laundry services are not one of the services specified in section 501(e)(I)(a) [sic], the organization does not meet the requirements of section 501(e) of the Code, and thus is not exempt from Federal income tax under Section 501(c)(3). See Rev.Rul. 69–160 C.B. 1969–I, 147. Also see Rev.Rul. 69–633.

On December 16, 1976, HCSC-Laundry filed a federal corporate income tax return (form 1120) for the fiscal year ending June 30, 1976 indicating taxable income of $123,-521.00 on which a federal income tax of $10,395.00 was paid. Promptly thereafter, it filed a Claim for Refund for overpaid federal income tax in the full amount paid,

asserting it was "a tax-exempt organization under sections 501(c)(3) and/or 501(e) of the Internal Revenue Code of 1954." Although the IRS has informally advised HCSC-Laundry that the claim for the refund of taxes will be rejected, it has not taken formal action on this claim. This suit seeking a refund of the taxes paid followed.

The district court, on the basis of stipulated facts, entered summary judgment for HCSC-Laundry. *HCSC-Laundry v. United States,* 473 F.Supp. 250 (E.D.Pa.1979). It held that despite the omission of laundry services from those particular services for hospitals which are exempted under section 501(e) of the Code, HCSC-Laundry was entitled to exemption as an organization described in section 501(c)(3) of the Code. The court concluded:

> The purpose of § 501(e) was to enlarge the category of charitable organizations exempt under § 501(c)(3), not to modify or narrow § 501(c)(3). Thus, it is improper to consider the addition of § 501(e) as causing to be excluded from § 501(c)(3) any organization that would have been included in § 501(c)(3) but for § 501(e), even if such organization was explicitly excluded from § 501(e) itself.

*Id.* at 253.

The court also rejected the IRS assertion that HCSC-Laundry was not entitled to a charitable exemption because it was a

performed on its own behalf by a hospital which is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), would constitute activities in exercising or performing the purpose or function constituting the basis for its exemption: data processing, purchasing, warehousing, billing and collection, food, clinical, industrial engineering, laboratory, printing, communications, record center, and personnel (including selection, testing, training, and education of personnel) services; and

(B) to perform such services solely for two or more hospitals each of which is—

(i) an organization described in subsection (c)(3) which is exempt from taxation under subsection (a),

(ii) a constituent part of an organization described in subsection (c)(3) which is exempt from taxation under subsection (a) and which, if organized and operated as a separate entity, would constitute an organization described in subsection (c)(3), or

(iii) owned and operated by the United States, a State, the District of Columbia, or a possession of the United States, or a political subdivision or an agency or instrumentality of any of the foregoing;

(2) such organization is organized and operated on a cooperative basis and allocates or pays, within 8½ months after the close of its taxable year, all net earnings to patrons on the basis of services performed for them; and

(3) if such organization has capital stock, all of such stock outstanding is owned by its patrons.

For purposes of this title, any organization which, by reason of the preceding sentence, is an organization described in subsection (c)(3) and exempt from taxation under subsection (a), shall be treated as a hospital and as an organization referred to in section 170(b)(1)(A)(iii).

"feeder" organization under section 502(a) of the Code. That section provides that:

An organization operated for the primary purpose of carrying on a trade or business for profit shall not be exempt from taxation under section 501 on the ground that all of its profits are payable to one or more organizations exempt from taxation under section 501.

The court found that HCSC-Laundry was "a non-profit enterprise wholly controlled by charitable organizations 'in order to effect economies in their own operations'," 473 F.Supp. at 254, and determined that since HCSC-Laundry was an integral part of the hospitals, it was not a feeder organization under section 502(a) as clarified by the applicable Treasury Regulation on Income Tax, 26 C.F.R. § 1.502–1 (1979).[5] 473 F.Supp. at 254–55.[6] Therefore the court held HCSC-Laundry was exempt from taxation as an exempt organization under section 501(c)(3) of the Internal Revenue Code of 1954. *Id.* at 255.

### III.

On appeal, the IRS argues that the legislative history indicates that section 501(e) is the exclusive method whereby a hospital service organization, such as HCSC-Laundry, is entitled to tax-exempt status. It asserts that the Congressional intent is clear that a hospital service organization performing laundry services is not entitled to tax exempt status. It is joined in this position by the Textile Rental Services Association of America and the International Fabricare Institute who have filed a brief amici curiae.

HCSC counters that the district court's construction holding it exempt is in accord with the applicable precedent. It contends that since the laundry performs on a joint basis the same hospital laundry activity which previously each of its members either performed individually as part of their tax-exempt activities or had performed for them by commercial laundries, the exemption should continue regardless of the form in which conducted, *i. e.*, jointly rather than separately.

### IV.

It has been an accepted precept of statutory construction of tax laws, that a specific

---

**5.** The relevant part of the regulation provides:

(b) If a subsidiary organization of a tax-exempt organization would itself be exempt on the ground that its activities are an integral part of the exempt activities of the parent organization, its exemption will not be lost because, as a matter of accounting between the two organizations, the subsidiary derives a profit from its dealings with its parent organization, for example, a subsidiary organization which is operated for the sole purpose of furnishing electric power used by its parent organization, a tax-exempt educational organization, in carrying on its educational activities. However, the subsidiary organization is not exempt from tax if it is operated for the primary purpose of carrying on a trade or business which would be an unrelated trade or business (that is, unrelated to exempt activities) if regularly carried on by the parent organization. For example, if a subsidiary organization is operated primarily for the purpose of furnishing electric power to consumers other than its parent organization (and the parent's tax-exempt subsidiary organizations), it is not exempt since such business would be an unrelated trade or business if regularly carried on by the parent organization. Similarly, if the organization is owned by several unrelated exempt organiza-

tions, and is operated for the purpose of furnishing electric power to each of them, it is not exempt since such business would be an unrelated trade or business if regularly carried on by any one of the tax-exempt organizations . . . .

26 C.F.R. § 1.502–1(b) (1979).

**6.** In a recent decision presenting a similar fact pattern where a Louisiana laundry service organization providing laundry service to four participating hospital members sought tax exemption, a divided Tax Court denied exemption on the ground that the organization was a feeder organization. *Associated Hospital Services, Inc. v. Commissioner*, 74 T.C. No. 17 (1980). It reached that result by application of the "re-enactment doctrine" under which treasury regulations and interpretations which have continued over a long period of time without substantial change, and which apply to unamended or substantially reenacted statutes, are deemed to have received Congressional approval. See *Helvering v. Winmill*, 305 U.S. 79, 83, 59 S.Ct. 45, 46, 83 L.Ed. 52 (1938). The Government has not appealed from the district court's disposition of this issue and it is therefore not before us.

statute controls over a general one. *Bulova Watch Co. v. United States*, 365 U.S. 753, 758, 81 S.Ct. 864, 867, 6 L.Ed.2d 72 (1961). In *Nitzberg v. Commissioner*, 580 F.2d 357 (9th Cir. 1978), the appeal posed the problem of whether certain losses incurred in connection with the operation of gaming tables are to be treated as "ordinary and necessary expenses" deductible under I.R.C. § 162(a), or as "losses from wagering transactions", deductible only to the extent of gains from such transactions, under I.R.C. § 165(d). The court applied the foregoing precept and held the provision providing specifically for wagering losses governed. *See also State Mutual Life Assurance Co. v. Commissioner*, 246 F.2d 319, 323 (1st Cir. 1957).

In the discussion of the application of this precept as an aspect of the *ejusdem generis* rule which appears in 1 J. Mertens, The Law of Federal Income Taxation § 3.16, at 34 (1974), it is noted that "this rule of ejusdem generis is not invariable and should not defeat the legislative intent deducible from the entire context." The statutory provisions at issue in this case would, under ordinary circumstances, warrant application of the rule of *ejusdem generis* since section 501(e) deals specifically with jointly operated hospital services. Therefore, unless the legislative history indicates a contrary legislative intent, section 501(e) should be considered controlling.

Before the 1969 amendments to the Internal Revenue Code which added section 501(e) to the statute, there was no provision of the Code specifically dealing with mutual entities established by tax exempt hospitals to supply them with certain services. The Internal Revenue Service took the position that if two or more tax exempt hospitals had joined together to create an entity to perform ordinary commercial services for them, the entity was not a tax exempt organization.[7]

In 1967 a Senate amendment would have treated organizations created by tax exempt hospitals to supply them with certain commercial services as charitable organizations. This amendment was not accepted by the House. H.R.Rep. No. 1030, 90th Cong., 1st Sess. 73 (1967). A House Report from the same session, directed to a bill which would have allowed Hill-Burton funds for cooperative hospital facilities regardless of their exempt status under the Internal Revenue Code, referred to the IRS interpretation that "an organization established by a number of other organizations to provide services or facilities for them, is not considered 'nonprofit,' even though the organizations for whom the services or facilities are provided are each non-profit." H.R.Rep. No. 538, 90th Cong., 1st Sess. 32 (1967).

The following year, Congress began work on the tax amendments which were to culminate in the enactment of section 501(e). The Senate proposed an amendment to the Tax Adjustment Bill of 1968 which would have treated as charitable organizations almost all entities established by tax exempt hospitals to provide commercial services, including laundry service. 114 Cong.Rec. 7516 (1968); 114 Cong.Rec. 8111–12 (1968). In the Conference Committee the House acceded only to a more limited scope for section 501(e). Under the version of 501(e) which emerged from the Conference Committee, certain specified service organizations were to be treated as "organized and operated exclusively for charitable purposes." Mutual laundry service organizations were not among the specified service organizations. However, the omission of laundry services was not inadvertent.

The Conference report specifically states:

> The new subsection does not grant tax-exempt status if the hospital service organization performs any services other than those specified in the new subsection (for example, laundry services), or performs any services for any person or organization other than a tax-exempt hospital.

---

7. See Rev.Rul. 54–305, 1954–2 C.B. 127.

H.R.Rep. No. 1533, 90th Cong., 2d Sess. 43 (1968).[8] It is further of interest that the then Acting Commissioner of the Internal Revenue wrote to the then Chief of Staff of the Joint Committee on Internal Revenue setting forth his understanding that "the cooperative laundry service itself would not be tax exempt."[9]

Although subsequent legislative history may not be as persuasive as contemporaneous history in indicating a Congressional intent in the case of the interpretation of section 501(e) it also serves to demonstrate that the general understanding of those most directly affected, the hospitals, was that cooperative hospital laundries were not entitled to obtain "charitable" status under the Code. Accordingly, in 1976 the American Hospital Association requested the Senate Finance Committee to extend tax exempt status to cooperative hospital organizations that performed laundry services. That statement included the following:

> Although not permitted under Section 501(e), central laundries to serve hospitals and other health care institutions are generally recognized as offering many benefits and advantages over individual hospital laundries, and over many commercial laundries that, if available at all, may not provide the type of quality of specialized service that hospitals require.

The statement continued:

> From the legislative history of Section 501(e) we understand that Congress intended to permit a comprehensive range of both administrative and clinical activities to be performed by 501(e) organizations, but to exclude laundry services.

Among the various recommendations made by the American Hospital Association was the following:

> That Section 501(e) of the Internal Revenue Code be amended to include "laundry services" among the activities cooperative hospitals services organizations may perform for their members.

*Tax Reform Act of 1975: Hearings on H.R. 10612 Before the Sen. Comm. on Finance,* 94th Cong., 2d Sess. 2771–72 (1976) (statement of the American Hospital Association). The American Hospital Association proposal was opposed by the representatives of commercial laundries, who urged the Senate Finance Committee not to give special tax treatment to central laundries. *See Certain Committee Amendments to H.R. 10612: Hearings Before the Sen. Comm. on Finance,* 94th Cong., 2d Sess. 200 (1976) (statement of John J. Contney, Executive Director, Linen Supply Association of America).

Although the Tax Reform Act of 1976, Pub.L. 94–455, 90 Stat. 1520, contained an amendment to section 501(e) which would have included laundry services within the services specified in section 501(e), and this amendment was endorsed by the Senate Finance Committee, it was deleted from the Tax Reform Act by action on the floor of the Senate. *See* 122 Cong.Rec. 25915 (1976).

Thus a review of the legislative history supports the Internal Revenue Service's position that the statute reflects an explicit manifestation of legislative judgment and purpose not to afford cooperative hospital laundries tax exempt status.

8. This interpretation was referred to again in the Conference Committee print on the 1968 statute which specifically noted that:

> The conferees agreed to the Senate provision, but limited it to a joint enterprise which is organized and operated *solely* to perform one or more of the following services for hospitals: data processing, purchasing, warehousing, billing and collection, food, industrial engineering, laboratory, printing, communications, record center, and personnel. *Thus, an organization is not to qualify for exemption under this section if it performs any other services such as, for example, gen-*

*eral laundry services or performs any services for other than a tax-exempt hospital.* Committee of Conference on H.R. 15414, 90th Cong., 2d Sess., Revenue and Expenditure Control Act of 1968, Explanation of the Bill H.R. 15414. As Agreed to in Conference 20 (Comm. Print 1968) (emphasis added).

9. Letter from Lawrence N. Woodworth to James F. Dring (Feb. 10, 1969) *reprinted in* App. C to Brief for the Appellant at 58, adopted by letter from William H. Smith, Acting Commissioner, to Lawrence N. Woodworth (Feb. 16, 1969) *reprinted id.* at 62.

It may be that Congress was misguided in its failure to include laundry services among those services specified in 501(c). It may be that in these days of high energy costs and rapidly accelerating hospital costs, tax exemption for mutual laundry services would be in the public interest. But, as the appellee's brief points out, "intensive lobbying pressure by commercial laundries resulted in hospital laundry activities being excluded from those activities to which specific legislative relief was granted." Appellee's brief, p. 29. The result reflects the political process in operation. Requests for relief or for change must be directed to Congress.

The district court relied on the line of cases holding that a hospital laundry service organization could qualify as a charitable organization under section 501(c). *Northern California Central Services, Inc. v. United States*, 591 F.2d 620 (Ct.Cl.1979); *Community Hospital Services, Inc. v. United States*, 79–1 U.S.T.C. ¶ 9301 (E.D.Mich. 1979); *Metropolitan Detroit Area Hospital Services, Inc. v. United States*, 445 F.Supp. 857 (E.D.Mich.1978); *Hospital Central Services Association v. United States*, 77–2 U.S. T.C. ¶ 9601 (W.D.Wash.1977); *United Hospital Services, Inc. v. United States*, 384 F.Supp. 776 (S.D.Ind.1974).

In three of those cases, *Metropolitan Detroit Area Hospital Services, Community Hospital Services, Inc.*, and *Hospital Central Services Association*, the courts said they reached their decisions on the basis of the decision of the original case in that series, *United Hospital Services, Inc. v. United States, supra*. That case, in turn, found persuasive the reasoning in *Hospital Bureau of Standards and Supplies, Inc. v. United States*, 158 F.Supp. 560, 141 Ct.Cl. 91 (1958). It is those two cases which should be considered.

In *Hospital Bureau*, plaintiff taxpayer was a New York corporation which purchased hospital supplies in bulk from suppliers on behalf of its 207 hospital members to whom the resulting savings accrued, and also maintained a research department and conducted technical analysis of supplies or-

dinarily used by its member institutions. It claimed exemption as a charitable organization for the calendar years 1952 and 1953. At the time of the decision there had been no discussion in Congress about enactment of a specific provision to provide tax exemption for hospital service organizations. The only issue before the court was whether the taxpayer could be considered a corporation "organized and operated exclusively for . . . charitable purposes" under the predecessor provision to section 501(c). The Court of Claims held that it was entitled to be so considered. That decision provides little assistance to the statutory analysis we must now undertake when the statute contains the subsequently enacted provision directly applicable to hospital service organizations.

By the time of the decision in *United Hospital Services, Inc. v. United States*, the first case to consider the tax status of a hospital laundry service organization, the statute had been amended to include section 501(e). Nonetheless, the court held that the "case is completely analogous to *Hospital Bureau of Standards and Supplies . . . .*" 384 F.Supp. at 781. Although the court recognized that "Congress intentionally omitted ordinary, general and commercial laundry services from the blanket exemption granted to hospital cooperatives in Section 501(e)," *id.* at 780, it held the taxpayer could be considered a charitable organization under Section 501(c)(3) on its own merits. It is not clear whether the *United States Hospital Services* decision is dependent upon the fact that the taxpayer was incorporated and doing business some years before section 501(e) was adopted in 1968, a fact stressed by the court. Later cases have not limited the holding in that way. See *Metropolitan Detroit Area Hospital Services*, 445 F.Supp. at 860–61.

In the most recent decision on comparable facts, *Northern California Central Services, Inc. v. United States, supra*, the Court of Claims adhered to its prior decision in *Hospital Bureau*. After considering the effect of section 501(e), it concluded that the intent of Congress was not to narrow the

class of organizations entitled to an exemption as a "charitable organization" but to broaden that class, "and that, as to laundry services, it left the law as it was." *Id.* at 624. As noted in our prior discussion, we believe the legislative history to show a contrary legislative intent than that found by the Court of Claims. We believe that it demonstrates that Congress recognized that hospital service organizations were not heretofore encompassed within section 501(c), or that their inclusion within that section was questionable. In order to clarify its position, Congress enacted section 501(e) to specify that certain types of hospital service organizations shall be considered as charitable organizations. If they had already been within section 501(c), the enactment of section 501(e) would have been a totally superfluous undertaking by Congress, an anomalous result which we cannot attribute to it.[10]

We are constrained to hold that section 501(e) specifies the types of hospital service organizations which are encompassed within the scope of section 501(c) as "charitable organizations," and that since HCSC-Laundry does not fall within section 501(e), it is not entitled to treatment as a tax exempt organization. For the foregoing reasons, we will reverse the judgment of the district court and remand for further proceedings not inconsistent with this opinion. Each side will bear its own costs.

---

**10.** The result of our decision will not necessarily be that plaintiff must hereafter pay income taxes. It may be possible to structure the arrangement with the hospitals in some way to avoid receipt of any net income. One possible approach was suggested by then Acting Commissioner of the Internal Revenue Service. See letter referred to in note 9 *supra.* We need not decide that issue now.